Felix CLAUSS, Jr., Thomas R. Clauss and
Anna M. Clauss, t/a Felix Clauss
and Sons

v.

AMERICAN INSURANCE COMPANY
and
Paul Rumer and City of Philadelphia.
Civ. A. No. 26076.

United States District Court
E. D. Pennsylvania.
March 4, 1963.

See also 183 F.Supp. 443.

Blank, Rudenko, Klaus & Rome, by Henry J. Morgan, Philadelphia, Pa., for plaintiffs.

White & Williams, by Thomas Raeburn White, Jr., Philadelphia, Pa., for defendant American Ins. Co.

Meyer, Lasch, Hankin & Poul, by Milford J. Meyer, Philadelphia, Pa., for defendant Paul Rumer.

Edward G. Bauer, Jr., City Solicitor, Philadelphia, Pa., by Vincent Veldorale, Philadelphia, Pa., for defendant City of Philadelphia.

JOSEPH S. LORD, III, District Judge.

The court adopts the Stipulation and Supplemental Stipulation of counsel, including references to exhibits, as its Findings of Fact Nos. 1 through 18, and in addition thereto finds:

19. The accident of February 1, 1958, took place after plaintiffs' work at the site of the accident had been completed or abandoned within the meaning of Policy No. K215 0621.

20. The accident of February 1, 1958, took place away from premises owned, rented or controlled by plaintiffs within the meaning of Policy No. K215 0621.

## DISCUSSION

Plaintiffs seek a declaratory judgment against defendant insurance company respecting their coverage under a comprehensive liability insurance policy issued by defendant. On August 8, 1956, the City of Philadelphia awarded plaintiffs a contract (No. SD–244–NE) [1] for the Byberry Creek project, which included the excavation of a trench across both lanes of the Roosevelt Boulevard, the construction of a sewer within the trench, backfilling and repaving the roadway. That portion of the work was finished on February 7, 1957, and the entire project was finished October 18, 1957.

On or about October 11, 1957, defendant issued its policy No. K215 0621 to plaintiffs covering liability arising from plaintiff's sewer operations. The policy contained an endorsement entitled "Exclusion of Products Hazard" which provided that "It is agreed that the policy does not apply to the products hazard as defined herein." Products hazard is defined in pertinent part ["Conditions", Section 3(f) (a)]:

" * * * operations, if the accident or occurrence takes place after such operations have been completed or abandoned and take place away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in division (a) of the declarations specifically includes completed operations."

On February 1, 1958, one Paul Rumer suffered a serious accident at or near the site where the work had been done. Rumer sued the City and the present plaintiffs in the Court of Common Pleas of Philadelphia County and recovered a verdict against both defendants.

The dispute here is whether plaintiffs are covered under the policy issued October 11, 1957.

The late Judge Egan has already decided (Opinion, August 14, 1959; Order, September 18, 1959) that the exclusionary clause in Section 3(f) of "Conditions" is applicable to plaintiffs' operations. Although plaintiffs strongly urged that I reconsider Judge Egan's ruling, I felt myself bound by the law of the case: United States v. Wheeler, 256 F.2d 745 (C.A. 3, 1958). For this rea-

---

1. Pertinent portions of the contract, and of the Standard Contract Requirements and Standard Specifications for Excavation, Refilling, Grading, Landscaping and Repaving, both of which were made part of the contract are referred to below.

son, although Judge Egan's ruling was interlocutory and not appealable, I express no opinion on this phase of the case. For the same reason, I did not permit the plaintiffs to present evidence on the question of the applicability of the exclusionary clause.

In this posture of the case, and with regard to Condition 3(f) (2), there are two narrow questions before me: (1) was plaintiffs' work "completed" within the meaning of the policy on February 1, 1958; (2) did the accident for which coverage is sought happen "away from premises owned, rented or controlled" by plaintiffs. I cannot escape the conclusion that both questions must be answered in the affirmative.

■■ The operation involved was the construction of a sewer and the consequent back-filling of the ditch and re-paving of the roadway. That work was finished on October 18, 1957, according to plaintiffs' answers to defendant's interrogatories (See also Stipulation paragraphs 3 and 4). This is the operation that was covered by the policy, and this operation was completed before February 1, 1958. It is safe to assume that when plaintiffs laid the last yard of roadway, they expected never to return to Roosevelt Boulevard and Byberry Road because, again assumedly, they must have felt their work was satisfactory. The City felt the same way; the work was approved not later than October 24, 1957, even though this approval was not communicated to plaintiffs until March 11, 1958, by payment.

Plaintiffs argue that under their contract with the City and its concomitant documents, they had certain continuing obligations and that so long as these obligations remained, the work was not completed. Thus, the contract itself provides:

"Party of the second part shall have charge and control of the entire work until completion and acceptance of the same by party of the first part. Party of the second part

shall be alone liable and responsible for, and shall pay, any and all loss and damage sustained by any person or party either during the performance or subsequent to the completion of the work covered by this agreement, by reason of injuries to person and damage to property, buildings and adjacent work, that may occur either during the performance or subsequent to the completion of the work covered by this agreement, or that may be sustained as a result or consequence thereof, irrespective of whether or not such injuries or damage be due to negligence or to the inherent nature of the work. * * * The term 'work' as used herein shall be deemed to include work of repair or maintenance performed under this agreement, irrespective of whether or not the same is required by the terms hereof."

The Standard Contract Requirements, which are made a part of the contract provide (Section 28):

"The Contractor shall guarantee the work of the contract against defectiveness of material and workmanship for a period of one year after the date of completion and acceptance by the City, unless otherwise specifically required for a longer period. * * *"

Finally, Section E–62 of the Standard Specifications for Excavation, Refilling, Grading, Landscaping and Repaving, also specifically a part of the said contract, provides that:

"The whole of the regrading and repaving must be done in conformity with existing ordinances, to the satisfaction of the Director of Public Works, and kept in good repair for a period of one year from the date of final payment. If any part of the street, sidewalk or curbing on the line of the work shall, in the opinion of the Director, require repairs within one (1) year after the date of final payment, the contrac-

tor shall, within twenty-four (24) hours of the date of notice given, make the necessary repairs."

Obviously, as of October 18, 1957, or February 1, 1958 (the accident date), it was impossible to tell whether any of these obligations would become operative. The operation itself was completed.[2] If anything was to be done, or in fact was done thereafter, it was in the nature of repair or maintenance. And the parties by their insurance contract specifically excluded such activities from coverage. Condition 3(f) (2) provides in part:

" * * * provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement."

The rights and obligations that exist as between plaintiffs and defendant are to be determined by their contract. If, for example, the insurance contract had provided that an operation is "completed" when the insured removes his equipment from the site, the removal would be determinative, even though the insured's contract with the City imposed a continuing obligation to repair. So here, even though there may be such a continuing obligation as to the City, the insurance contract effectively eliminated this as a factor preventing completion. The work was *in fact* completed within the meaning of the exclusionary clause.

Plaintiffs further argue that the proof fails to show that the accident happened "away from premises owned, rented or controlled by the named insured" [Condition 3(f) (2)]. The City contract provided:

"Party of the second part shall have charge and control of the entire work until completion and acceptance of the same by party of the first part. * * *"

2. This was not a case where the contractor's employes left the premises while work was merely suspended. McNally v.

Plaintiffs point out that they were not paid for the work until March 11, 1958, and that payment is the usual method by which a contractor is notified of acceptance. From this, plaintiffs argue that they were in control of the work at least until that date.

To my way of thinking, there are two answers to plaintiffs' argument. First, the work had been accepted internally. That is, by October 27, 1957, the governmental subdivisions involved had, by that date, agreed that the work had been satisfactorily completed. The policy does not say that the acceptance must be communicated; indeed, it does not even refer to "acceptance". Second, after the trench had been filled and repaved, and opened to vehicular traffic, it would be factually unrealistic to say that plaintiffs controlled the "premises". Control of the *work* is something different from control of the *premises*, and while, as between the City and plaintiffs, the latter may still have had control of the work almost four months after its completion, they did not control the premises. If more work was required or was, in fact, done, as happened in July, 1959, plaintiffs, during its pendency, might be said to be in control of that area where the work was actually being done. Absent that, however, they were no longer in control of a highway over which the traveling public moved. Again, an example may be helpful: suppose that in July, 1958 (an arbitrary date), with no work in progress or contemplated, plaintiffs had erected barricades across both lanes of the Roosevelt Boulevard. Their supposed "control" would have had short shrift when traffic began to back up. There is no doubt in my mind that the accident happened away from premises controlled by plaintiffs.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties.

American States Insurance Company, 308 F.2d 438 (C.A.6, 1962).

2. The Court has jurisdiction over the subject matter.

3. Defendant is not liable to insure plaintiffs against liability for the accident of February 1, 1958.

4. Defendant is entitled to judgment in its favor against plaintiffs.